# MINNEAPOLIS & ST. PAUL SUBURBAN RAILROAD COMPANY v. VILLAGE OF BIRCHWOOD AND ANOTHER.[1]

July 22, 1932.

Nos. 29,082, 29,087.

[1]Reported in 244 N. W. 57.

564

*Keller, Broady & Chapin,* for appellants.

*Junell, Oakley, Driscoll & Fletcher* and *George H. Sullivan,* for respondent.

DIBELL, J.

The petitioner, Minneapolis & St. Paul Suburban Railroad Company, is a corporation organized under the laws of Minnesota for the purpose of conducting railroad operations as a common carrier. It has a system of electric lines. It seeks to abandon a line 4.43 miles in length extending from Wildwood, Minnesota, westerly ·to White Bear, Minnesota, and connecting at Wildwood with St. Paul and with Stillwater. It petitioned the railroad and warehouse commission for leave to abandon and close the line to traffic. The commission, after a public hearing, found that such abandonment and closing would not result in substantial injury to the public, and the petition was granted. On appeal to the district court the order of the commission was affirmed, and judgment was entered for the petitioner. The village of Birchwood and the township of White Bear, both affected by the judgment, appeal.

The question is whether the commission on sufficient evidence found that the Wildwood-White Bear line could be abandoned without substantial injury to the public. G. S. 1923 (1 Mason, 1927) § 4930. Preliminary to a determination of this question it may be noted and it is not denied that a railroad cannot be compelled, stating the proposition generally, to run at a loss. Brooks-Scanlon Co. v. Railroad Comm. 251 U. S. 396, 40 S. Ct. 183, 64 L. ed. 323 ; Bullock v. State, 254 U. S. 513, 41 S. Ct. 193, 65 L. ed. 380 ; Railroad Comm.

v. Eastern Texas R. Co. 264 U. S. 79, 44 S. Ct. 247, 68 L. ed. 569; Georgia Power Co. v. City of Decatur, 281 U. S. 505, 50 S. Ct. 369, 74 L. ed. 999; Hill City Ry. Co. v. Youngquist (D. C.) 32 F. (2d) 819; State v. D. & N. M. Ry. Co. 150 Minn. 30, 184 N. W. 186.

■ Though a railway company has the constitutional right to abandon its road for the reason that it can be operated only at a loss, the legislature has not given the railroad and warehouse commission power to authorize an abandonment on that ground. The power to authorize an abandonment is conferred upon the commission by G. S. 1923 (1 Mason, 1927) § 4930, as follows:

"Any such company desiring to abandon or close for traffic any portion of its line, siding, sidetrack, spur or other railway track, shall first make application to the commission in writing. Before passing upon such application the commission shall fix a time and place for hearing and require such notice thereof to be given as it deems reasonable. Upon the hearing, the commission shall ascertain the facts and make findings thereon, and if such facts satisfy the commission that the proposed abandonment or closing for traffic will not result in substantial injury to the public, they may allow the same, otherwise, it shall be denied, or, if the facts warrant it, the application may be granted in a modified form."

To make such authorization it must appear that the abandonment will not result in substantial injury to the public. Hill City Ry. Co. v. Youngquist (D. C.) 32 F. (2d) 819; State v. D. & N. M. Ry. Co. 150 Minn. 30, 184 N. W. 186, 187. In the D. & N. M. Ry. Co. case the commission said [150 Minn. 33]:

"In view of the fact that the Duluth and Northern Minnesota Railway Company cannot operate its line of road except at a loss, the commission finds that the Duluth and Northern Minnesota Railway Company have the right to abandon the operation and use of the same as a common carrier."

The district court revoked the order upon the ground that the statute had not given the commission power to authorize the abandonment of the railroad on a finding that it could be operated only

at a loss, without a further finding that the abandonment would not result in substantial injury to the public, just as the statute says. The evidence showed without dispute that the road could not be operated except at a substantial loss, and that was the finding of the commission. In referring to G. S. 1923 (1 Mason, 1927) § 4930, Judge Taylor said [150 Minn. 34]:

"The statute, under which this proceeding was brought, was enacted long before the Federal Supreme Court announced that a railway company had the constitutional right to abandon its road, unless it could be operated at a profit, and the legislature, in enacting the statute, apparently did not have in mind such a situation as is here presented, and made no provision for it. While it might seem desirable that the question whether a railway company has the right to abandon its road because it cannot be operated at a loss, should be determined in some orderly and authoritative manner before the road is closed to traffic, and while the Railroad and Warehouse Commission is probably the only agency of the state which possesses the facilities and machinery for ascertaining and determining the questions of fact involved, yet that commission possesses only the authority given to it by the legislature and cannot exceed the bounds to its power fixed by the legislature.

*     *     *     *     *

"By this provision the legislature has expressly limited the power of the commission to authorize an abandonment to those cases in which they find as a fact that such abandonment 'will not result in substantial injury to the public.' They did not find such fact in the present case; on the contrary, they found, in effect, that the proposed abandonment would result prejudicially to a large number of permanent residents served by the road who have no other convenient access to the markets of the country. Consequently, by reason of the express limitation imposed by the legislature, the commission was without power to make the order here in question. Of course in so far as the prohibitory provisions of the statute infringe the constitutional rights of the company, such provisions cannot be enforced."

The suggestion of the case cited is that the prohibitory provisions of § 4930 would not be effective if the road could not be run except at a loss, for this would be an infringement of the constitutional right; and it may be thought that the statute offers a method whereby the right to abandon may be determined in advance, though if the determination were adverse to the railroad it would still be protected by the constitution. What is to be in mind is that in the proceeding before us the question is whether the abandonment or closing for traffic of the Wildwood-White Bear line will result in substantial injury to the public.

■ Upon the question whether the abandonment of the Wildwood-White Bear line will result in substantial injury to the public, the matter of the loss in its continued maintenance is of consequence. A continued and increasing loss to the system road has some bearing on the question of substantial injury to the public. Its importance varies from case to case as circumstances differ.

The facts as to the financial set-up of the petitioner are something to be considered when the query is as to the abandonment of one line of the system. The petitioner is the owner of the Wildwood-White Bear line. It is the owner of other electric lines. A line extends from east Seventh street and Duluth avenue in St. Paul to Wildwood and from there a branch easterly to Stillwater and a branch westerly to White Bear and a line northerly to Mahtomedi. It has other lines, some tributary to St. Paul and some to Minneapolis. The stock of the petitioner company, except directors' qualifying shares, is owned by the Twin City Rapid Transit Company. In the same way the Twin City Rapid Transit Company owns the stock of the St. Paul City Railway Company; of the Minneapolis Street Railway Company; of the Twin City Motor Bus Company; and of the Transit Supply Company, a purchasing corporation, which is described as a fiscal agent for the other companies. Its exact relation to them need not be pursued for present purposes.

The gross revenues and the net revenues of the system have decreased for a number of years, and the net loss of the system has constantly increased. In 1926 the system's gross revenue was $377,011.80; for 1927, $355,980.30; for 1928, $333,514.04; for 1929,

$304,356.17; for 1930, $253,432.12; and for the first nine months of 1931, $158,736.34. Its net loss for 1926 was $32,024.10; for 1927, $549.03; for 1928, $10,431.33; for 1929, $40,733.47; for 1930, $33,516.58; and for the first nine months of 1931, $39,880.55. In making these computations there is no depreciation charge nor interest on a large subsisting indebtedness and no return on capital.

For the Wildwood-White Bear line we have the specific figures for 1930 and the first nine months of 1931 and no others. For 1930 the gross revenue was $5,209.08, which included $438.87 for incidental revenue other than passenger revenue, such as for advertising, chartered cars, and mail earnings. The operating charges were $13,723.81, not including taxes amounting to $260.45, and rent of power and shop facilities amounting to $1,944.32. If these two items were included, making a total of $15,928.58, there would be a net operating loss of $10,719.50; and if a charge-off were made for the estimated depreciation of $1,726.12, there would be a net loss of $12,445.62.

For the first nine months of 1931 the total revenue was $3,350.18, of which $3,116.40 was passenger revenue and $233.78 incidental revenue, such as advertising, chartered cars, and mail revenue. The total operating expenses were $9,089.44, not including $167.51 for taxes and $1,316.33 for rent of power and shop facilities. If these were included as a part of operating expenses the total would be $10,573.28, leaving a net operating loss of $7,223.10; and if estimated depreciation were included there would be a net loss of $8,517.69.

There is some criticism directed at the accuracy or proper application of these figures in determining net loss; but it is not so substantial as to require attention.

■ By statute the findings of the commission are prima facie evidence and its order prima facie reasonable. G. S. 1923 (1 Mason, 1927) § 4651. The applicable portion of the statute reads:

"Such findings of fact shall be prima facie evidence of the matters therein stated, and the order shall be prima facie reasonable, and the burden of proof upon all issues raised by the appeal shall

be on the appellant. If said court shall determine that the order appealed from is lawful and reasonable, it shall be affirmed and the order enforced as provided by law."

The commission brings to the question before it special training fitting it for the determination of the question involved; and it makes a special investigation and study. The district court tries the appeal "according to the rules relating to the trial of civil actions, so far as the same are applicable." It does not have special training, as has the commission, nor the commission's opportunity or facilities for investigation and study. It yields to the finding of the commission. 5 Dunnell, Minn. Dig. (2 ed. & Supp.) § 8082.

The commission finds that the decrease in net revenue has come through commercial motor competition and through the use of private automobiles whose owners drive to St. Paul and as an accommodation, or perhaps for compensation, convenience their neighbors. Upon this point it finds:

"That for more than ten years last past, the number of passengers carried on said line of railroad has been constantly and continuously decreasing due to the constant and continuous increase in the use of private automobiles and motor busses, and that there is no probability that such use of other forms of transportation will decrease."

The four-mile line is used by the commuters who go to and from St. Paul and make use of a part or all of the line. Some by preference walk and take the bus or electric line. The necessary distance is two miles or less. Roughly estimated, the petitioner's line is a distance of 200 to several hundred feet southerly of the shore. It is not a street railway. It does not serve house to house. It has its own right of way.

It is a carrier only of passengers. It does not carry freight. Between its right of way and the lake shore is an easterly and westerly street or boulevard and apparently a good one except for a half mile or mile from the easterly end. Most of the homes are between the street and the shore. Naturally the people desire immediate or close access to the lake. Few are southerly of the petitioner's line.

The lake is 10 or 12 miles northerly from the central district of St. Paul. White Bear connects with St. Paul through the Northern Pacific. There is also a bus line between White Bear and St. Paul on state trunk highway No. 1. This is the line of the Twin City Motor Bus Company, the stock of which is owned by the Twin City Rapid Transit Company. Another bus line extends from White Bear easterly to a point called Cottage Park, on the Wildwood-White Bear line, and then southerly to St. Paul on county road No. 18. There is an electric line, that of the petitioner, from St. Paul to Wildwood and then on northerly to Mahtomedi, and a line easterly from Wildwood to Stillwater. The territory south and east of White Bear is fairly served by motor bus transportation. It has good roads for motor traffic. The commission finds:

"That in addition to the line of railroad which petitioner seeks to abandon in this proceeding, it owns and/or operates certain other lines of railroad and certain street railway systems.

"That for many years last past, the revenues from all of the properties owned and/or operated by the petitioner have been insufficient to pay operating expenses and taxes incident to such operations, were proper allowance made in said operating expenses for depreciation.

"That the operation of the line of railroad which petitioner seeks to abandon in this proceeding cannot in the future be operated without substantial and increasing losses to the petitioner; that the petitioner has no funds with which to continue the operation of said line of railroad and no credit with which to obtain funds therefor and if compelled to continue the operation thereof, the petitioner will be unable to properly maintain said line of railroad, or the equipment used thereon, and will be unable to continue said operations without serious danger to passengers and the public."

Besides, with the coming of autos and motor transportation and the advent of good roads throughout the country, White Bear lake has been put in competition with other lakes affording attractive surroundings. With good roads and autos the matter of distance is not so important; and people desiring outings or places of summer residence can reach other lakes offering like attractions.

One of the officers connected with the petitioner testifies:

"We used to have from three, four, five, six, seven and eight thousand people out there on Sunday or the Fourth of July, and now we get anywhere from 250 to 300 people."

■ The commission's final finding, which has the approval of the trial court, is this:

"That from all of the evidence offered, the Commission finds that the abandonment and closing for traffic of the petitioner's line of railroad between Wildwood, Minnesota, and White Bear, Minnesota, will not result in substantial injury to the public."

Just what thought is included within the phrase "substantial injury to the public" is not sought to be made more clear. Perhaps no definition would help. The public is not one or two or three. A large number may be affected directly or indirectly. The word "substantial" carries with it some measure of relativity. It depends upon the attending circumstances—the facts which may be considered in determining the presence or absence of injury. The commission cannot make an arbitrary holding. The trial court has in mind that it is reviewing the finding of a trained and experienced commission charged with duties by the statute; and though it is in general an administrative body in character, it is required to exercise discretion and judgment and in a way it proceeds quasi judicially. The financial burden carried by the petitioner, the general geographical situation of the Wildwood-White Bear line, its relation to the other means of transportation, and the means of access to and from St. Paul, have been narrated. Access to the city from Wildwood or White Bear is not difficult. The only difficulty is as to the four-mile line reaching from the defendant's electric line at Wildwood to White Bear. A few, but only a few, people will be injured much by the abandonment of the line. It should be noted that the line is only for passenger traffic and is not for street railway purposes. That property may be rendered less desirable is only an incidental consideration and is not controlling. In reaching a determination there must be a balancing of considerations.

When people live together in communities each on occasion must yield to the other.

We have found no direct authority. By the transportation act of 1920, 49 USCA, § 1(18), it is provided:

"No carrier by railroad subject to this chapter shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the commission a certificate that the present or future public convenience and necessity permit of such abandonment."

In referring to this provision in Colorado v. U. S. 271 U. S. 153, 168, 46 S. Ct. 452, 456, 70 L. ed. 878, and having in view interstate and intrastate traffic, the court said:

"The sole test prescribed is that abandonment be consistent with public necessity and convenience. In determining whether it is, the Commission must have regard to the needs of both intrastate and interstate commerce. * * * The benefit to one of the abandonment must be weighed against the inconvenience and loss to which the other will thereby be subjected. Conversely, the benefits to particular communities and commerce of continued operation must be weighed against the burden there imposed upon other commerce. * * * The result of this weighing—the judgment of the Commission—is expressed by its order granting or denying the certificate."

In Transit Comm. v. U. S. 284 U. S. 360, 367, 52 S. Ct. 157, 159, 76 L. ed. 181, involving the same statute, the court said:

"The finding was that continued operation would result in a serious and increasing depletion of revenue, due to the competition by the city's rapid transit lines and their probable extension, which would entail an unreasonable burden on interstate commerce."

This, with the needs of the community served, and proof that the community could be adequately served by bus transportation, bore upon the question of public necessity and convenience.

Without further discussion, we hold that the evidence sustains the trial court in approving the findings of the commission.

Judgment affirmed.